IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

IN THE MATTER OF THE SEARCH OF:

|  |  |  |
|---|---|---|
| CELLULAR TELEPHONE ASSIGNED | ) | Case No. 1:20-mj- 183 |
| CALL NUMBER 423-206-8786 WITH | ) |  |
| INTERNATIONAL MOBILE SUBSCRIBER | ) |  |
| IDENTITY 311480593130232 | ) | **FILED UNDER SEAL** |
| (Target Cell Phone #10) | ) |  |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Andrew Bergren, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal
Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location
of the cellular telephone assigned call number 423-206-8786 with International Mobile Subscriber
Identity 311480593130232 with listed subscriber of TracFone Wireless, Inc., utilized by Megan
KNIGHT ("**Target Cell Phone #10**"), whose service provider is Verizon Wireless, a wireless
telephone service provider whose legal compliance center is headquartered at 180 Washington
Valley Road, Bedminster, NJ, 07921. **Target Cell Phone #10** is described herein and in
Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant seeks the prospective collection of information, including
cell-site location information, that may fall within the statutory definitions of information collected
by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested
warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The
requested warrant therefore include all the information required to be included in an order pursuant
to that statute. *See* 18 U.S.C. § 3123(b)(1).

3.     I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice, and have been since 1997.  As such, I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and empowered by law to conduct investigations of, among other things, offenses enumerated in Title 18, United States Code, Section 2516.   I have been employed as a Special Agent with DEA for the past 23 years.  In connection with my official DEA duties, I investigate criminal violations of the federal narcotics laws, including but not limited to, Title 21, United States Code, Sections 841, 843, 846, and 848.  I have received specialized training in the enforcement of laws concerning the activities of narcotics traffickers including four months of DEA basic training in Quantico, Virginia as well as periodic refresher training offered by the DEA. I am currently assigned to the Chattanooga Resident Office.

4.     During my experiences and tenure as a narcotics investigator, I have investigated and participated in investigations of organized criminal groups violating federal drug trafficking laws.  As part of my official duties, I have utilized and been involved with most traditional law enforcement techniques, including: visual surveillance, witness interviews, execution of search warrants, the use of cooperating witnesses, seizure of drug evidence, controlled purchases of drug evidence, court-authorized pen registers, court-authorized interceptions of wire communications, and undercover techniques.  I have debriefed numerous cooperating defendants and confidential informants regarding the habits, practices, methods, and general behavior of criminal groups engaged in organized criminal activity.  I have personally participated in Title III wire intercept investigations, including investigations involving large-scale drug trafficking organizations and drug traffickers.  I have received specialized training in conducting drug investigations and have attended training and lectures featuring government attorneys and law enforcement officials.

Case 1:20-mj-00183-CHS   Document 4   Filed 11/06/20   Page 2 of 15   PageID #: 9

5.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1), 846, and 843(b) have been committed, are being committed, and will be committed by **Megan Lee KNIGHT.** There is also probable cause to believe that the location information described in Attachment B and will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

7.    The court has jurisdiction to issue the proposed warrants because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## **PROBABLE CAUSE**

8.    The United States, including the Drug Enforcement Administration, is conducting a criminal investigation of Megan KNIGHT, Christopher AKERS, and others regarding possible violations of Title 21, United States Code, Sections 841(a)(1), 846, and 843(b).

9.    Since approximately September 2019, the DEA Chattanooga, Chattanooga Police Department ("CPD"), Red Bank Police Department ("RBPD"), and the Hamilton County Sheriff's Office ("HCSO") and other federal, state, and local law enforcement agencies have been involved in an investigation involving Megan KNIGHT, Christopher AKERS and others. Through this investigation, Megan KNIGHT was identified as a significant distributor of methamphetamine in

Tennessee. As detailed below, Megan KNIGHT was identified as a source of supply for methamphetamine and heroin.

10. On November 18, 2019, DEA Chattanooga conducted surveillance on Megan KNIGHT and her criminal associates. As a result of this surveillance, Tennessee Highway Patrol (THP) conducted a traffic stop on KNIGHT, Perry SHELBY, and Lolita EASON. During that traffic stop, SHELBY fled on foot and was apprehended. As result of the stop, approximately five kilograms of methamphetamine, a small amount of heroin, and psychedelic mushrooms were seized. SHELBY was arrested and transported to jail on State Charges. KNIGHT and EASON indicated they wanted to co-operate with law enforcement and were not charged at that time.

11. During an interview with KNIGHT, she advised that she had been purchasing three to five kilograms of methamphetamine, to distribute in the Chattanooga Area, from FNU LNU aka, "Present" in Atlanta, Georgia, and his brother, FNU LNU aka, "CHI" who resides in Mexico, since September 2019. KNIGHT provided information about "Present" to include his apartments, vehicles, and phone numbers. KNIGHT advised that she communicated with FNU LNU aka, "Present" and FNU LNU aka, "CHI" via telephone calls, texts messages, and Facebook Messenger. KNIGHT provided the phone number of "Present" as 470-416-1121.

12. On August 04, 2020, and your affiant and TFO William Johnson conducted an undercover purchase of one kilogram of methamphetamine from Armando MEJIA-ALMAZAN, aka "Present" in Norcross, Georgia, who the investigation has revealed is a source of supply for the KNIGHT DTO. Your affiant began undercover communications with MEJIA-ALMAZAN through Alfredo JACOBO DE JESUS, aka "Chi", believed to be in Mexico. JACOBO DE JESUS arranged the transaction between your affiant and MEJIA-ALMAZAN. Your affiant spoke with

MEJIA-ALMAZAN, aka "Present" on telephone number 773-900-1563, utilizing assigned undercover telephone number 423-262-2413. These conversations resulted in your affiant and SA Bergren meeting with MEJIA-ALMAZAN, aka "Present" to purchase one kilogram of methamphetamine for $12,500.00 USC of DEA Official Advanced Funds (OAF).

13.     On September 22, 2020, DEA Atlanta Field Division commenced court-authorized interception of wire and electronic communication from telephone number 773-900-1563 (**ATL TT-1**), utilized by Armando MEJIA-ALMAZAN aka "Present."

***Knight and Target Cell Phone #10***

14.     On October 17, 2020 at 1:23 pm, monitors intercepted a call between MEJIA on **ATL TT-1** and telephone number **423-206-8786** (**Target Cell Phone #10**), utilized by Megan KNIGHT. The following is a synopsis completed by monitors. The synopsis is not verbatim nor is it full or final form.

        a.       KNIGHT said she was about to pawn her car in order to get the rest of the money for MEJIA because she had been unable to find or get in touch with Chris. MEJIA said KNIGHT had no choice. KNIGHT asked if MEJIA would be sending her something back this time or not.  MEJIA said he wanted to wait until things were straight in case something else happened.  KNIGHT said Chris was not going to be involved, adding that she had changed the lock and was also planning on getting a restraining order on him (Chris) in case he came over. KNIGHT said her intention was never to steal from MEJIA or anything like that because MEJIA helped her out so much. MEJIA said he liked helping, and that he (Chris) was good to him (MEJIA). MEJIA said he did not know what KNIGHT was doing. MEJIA said he would give something to KNIGHT, then asked if KNIGHT's brother would be coming. KNIGHT said she was sorry but needed to put the phone down

(momentarily) because there was a cop. MEJIA asked if KNIGHT would be coming or someone else. KNIGHT said her brother would. MEJIA said okay, and that he was going to call KNIGHT when he (brother) got there. KNIGHT said all right, then asked if MEJIA would be sending her something back. MEJIA said yes, and asked KNIGHT to be responsible and not take it (possibly product) for too long. KNIGHT said yes. KNIGHT said he (possibly brother) said he had a birthday barbecue that would be done at 3:00 PM and then he (brother) would head down there. MEJIA said okay. KNIGHT said okay, and that she was trying to get the rest of the money now because Chris was not answering her calls and no one knew where he (Chris) was at. MEJIA told KNIGHT to make sure she was serious and responsible this time. KNIGHT said she would. KNIGHT said he (Chris) called her last night threating to kill her (KNIGHT), and taking Millie with him. MEJIA told KNIGHT to let him know that he (MEJIA) was looking for him (Chris), then told KNIGHT not to tell him (Chris) anything because he (Chris) would probably send the police over instead. MEJIA said he was pretty sure he (Chris) was the one who sent the undercovers that day because there was no one else (who could have done it). KNIGHT acknowledged.

15.    Your affiant, based on his training, experience and knowledge of this investigation believes that KNIGHT and MEJIA are discussing KNIGHT receiving more narcotics even though KNIGHT owes MEIJA for past drugs received. MEIJA sounds skeptical about giving KNIGHT more drugs before he is paid for the drugs that KNIGHT and AKERS received previously are paid off.  KNIGHT is trying to explain that she is committed to paying MEJIA off the past debt but is finding it difficult because AKERS will not talk to her or pay her money.  KNIGHT asked MEJIA

if he would be sending her back with drugs and MEJIA said yes and wants for KNIGHT to be responsible and pay him faster this time.

16.    On October 17, 2020 at approximately 2:21 pm, monitors intercepted another call between MEJIA on **ATL TT-1** and telephone number **423-206-8786** (**Target Cell Phone #10**), utilized by Megan KNIGHT. The following is a synopsis completed by monitors. The synopsis is not verbatim nor is it full or final form.

    a.    KNIGHT asked if MEJIA got the picture. MEJIA said he did, but instead he (MEJIA) needed money to pay those guys. KNIGHT said she understood that, but she was going to take that (rims), and send some money too. KNIGHT said she already gave him (possibly brother) 7 or 69 or something like that. MEJIA asked how much money they wanted for the wheels. KNIGHT said they (third party) wanted 1,200 for it. MEJIA asked if they had anything. KNIGHT said there were no scratches or anything on them. KNIGHT said that was 29 (2,900) minus the 1,200 that would be at least 1,700 and she already had that. MEJIA acknowledged. MEJIA said maybe next week, but to let him see. KNIGHT said he (owner of the rims) wanted 3 ounces for them, and she already gave him 1 (ounce). MEJIA acknowledged, then asked if the tires were good. KNIGHT said 2 of them were not, but there were 5 rims so the other 3 (tires) were good. KNIGHT said they were all worth 2,600 and there was nothing wrong with them. KNIGHT said MEJIA would need to take the rims off of his truck and then put these on his truck. MEJIA said maybe next week. KNIGHT said okay. KNIGHT said she was going to go ahead and get them (rims) and whenever MEJIA sent her something (possibly product) up here, she (KNIGHT) would go ahead and give him (owner of the rims) 2 more (ounces). MEJIA asked for clarification. KNIGHT said he (owner of the rims) wanted 3 ounces for them and she already paid him

1 (ounce). KNIGHT said when MEJIA sent her something back, she would then go ahead and give him (owner of the rims) the 2 (ounces) and get them (rims) for MEJIA. KNIGHT said MEJIA would then take that off from whatever Chris owed. KNIGHT said she knew she should not be paying his (Chris') shit. MEJIA said KNIGHT could bring them (rims) so he (MEJIA) could see them and if they were good, then they could talk about it. MEJIA said he did not want them (rims) for himself, and instead he would probably sell them to somebody. MEJIA said his rims were expensive too because they were original wheels from Chevy. KNIGHT said she thought she was going to be able to say no. KNIGHT asked what about the guns. MEJIA asked for clarification, KNIGHT said guns (PH). MEJIA asked for clarification. KNIGHT said pieces, bang-bang. MEJIA asked how many KNIGHT had. KNIGHT said she had her hands on 3 of them. MEJIA said those might be okay. KNIGHT said she would send a picture to MEJIA. MEJIA said maybe that would be okay. KNIGHT said all right and told MEJIA to check how much he (MEJIA) could give her for them. MEJIA said okay.

17.    Your affiant, based on his training, experience and knowledge of this investigation believes that KNIGHT and MEJIA are discussing KNIGHT trying to find a way to alleviate some of the debt owed to MEJIA by selling/trading vehicle rims and guns for drugs.  MEJIA sounds interested in the guns and possibly the rims.

18.    On October 6, 2020, U.S. Magistrate Judge Christopher Steger issued search warrant for geolocation for telephone number **Target Cell Phone #10**, utilized by Megan KNIGHT.  This order will expire soon.

19.    On October 10, 2020, your Affiant witness the court ordered geolocation of **Target Cell #10**, utilized by KNIGHT, travel toward Atlanta, GA. At approximately 5:53 pm, **Target Cell**

**Phone #10** was witnessed in the area of the Lacota Apartments at 6664 Peachtree Industrial Blvd, Dunwoody, GA. Your Affiant knows these apartments to be utilized by MEJIA for distribution of narcotics through previous information obtained during this investigation.

20. Your Affiant believes that based upon the aforementioned probable cause, that Megan KNIGHT continues to use **Target Cell Phone #10** to facilitate her drug trafficking activities and in the furtherance of this drug conspiracy. I believe that obtaining the requested geo-location of **Target Cell Phone #10** through Verizon WIRELESS will allow investigators to locate the subject(s) utilizing the Target Cell Phones without jeopardizing the investigation and therefore investigators will more likely be successful in obtaining the necessary evidence to further their investigation. I further believe that the requested search warrant will enable investigators to more effectively collect evidence of the crimes being committed by the targeted organization, identify locations utilized by the organization to facilitate their criminal activities, identify co-conspirators and their locations.

***Verizon Wireless and Location Information***

21. In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. [Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some

cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

22. Based on my training and experience, I know that Verizon Wireless can collect E-911 Phase II data about the location of the Target Cell Phones, including by initiating a signal to determine the location of the Target Cell Phones on Verizon Wireless's network or with such other reference points as may be reasonably available.

23. Based on my training and experience, I know that Verizon Wireless can collect cell-site data about the Target Cell Phones. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Verizon Wireless typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

**AUTHORIZATION REQUEST**

24. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

25. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until

90 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phones would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

26.     I further request that the Court direct Verizon Wireless to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Verizon Wireless**.** I also request that the Court direct Verizon Wireless to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Verizon Wireless's services, including by initiating a signal to determine the location of the Target Cell Phones on Verizon Wireless network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

27.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phones outside of daytime hours.

28.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant be sealed. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Additionally, this Affidavit contains statements of co-conspirators in the investigation which, if revealed at this time, may jeopardize the safety of said individuals or result in witness tampering or intimidation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____
Andrew Bergren
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on _____November 6_____, 2020

_____
HONORABLE CHRISTOPHER H. STEGER
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | |
| CELLULAR TELEPHONE ASSIGNED | ) | Case No. 1:20-mj-183 |
| CALL NUMBER 423-206-8786 WITH | ) | |
| INTERNATIONAL MOBILE SUBSCRIBER | ) | |
| IDENTITY 311480593130232 | ) | **FILED UNDER SEAL** |
| (Target Cell Phone #10) | ) | |

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephones assigned call number 423-206-8786 with International Mobile Subscriber Identity 311480593130232 with listed subscriber as TracFone Wireless, Inc., utilized by Megan Lee KNIGHT ("**Target Cell Phone #10**"), whose service provider is Verizon Wireless, a wireless telephone service provider whose legal compliance center is headquartered at 180 Washington Valley Road, Bedminster, NJ, 07921.

2. Records and information associated with the **Target Cell Phone #10** that are within the possession, custody, or control of Verizon Wireless: including information about the location of the cellular telephones if they are subsequently assigned a different call number.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | |
| CELLULAR TELEPHONE ASSIGNED | ) | Case No. 1:20-mj- 183 |
| CALL NUMBER 423-206-8786 WITH | ) | |
| INTERNATIONAL MOBILE SUBSCRIBER | ) | |
| IDENTITY 311480593130232 | ) | **FILED UNDER SEAL** |
| (Target Cell Phone #10) | ) | |

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be Disclosed by the Provider**

All information about the location of the **Target Cell Phone #10** described in Attachment A for a period of **thirty days**, during all times of day and night. "Information about the location of the **Target Cell Phone #10**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Verizon Wireless. Verizon Wireless is required to disclose the Location Information to the government. In addition, Verizon Wireless must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon Wireless's services, including by initiating a signal to determine the location of the **Target Cell Phone #10** on Verizon Wireless's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

The government shall compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to Be Seized by the Government

**IF LOCATION INFORMATION IS EVIDENCE OF A CRIME:**

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1), 846, and 843(b) involving Megan KNIGHT or unidentified subject(s).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.